[Crim. No. 4215.   In Bank.—July 11, 1939.]

THE PEOPLE, Respondent, v. EVERETT GILBERT PAR-
MAN, Appellant.

Thomas F. Sargent for Appellant.

Earl Warren, Attorney-General, and J. Q. Brown, Deputy Attorney-General, for Respondent.

SHENK, J.—The defendant was indicted by the grand jury of Placer County on two counts: (1) the murder of George McElroy in that county on July 16, 1938; (2) the violation of the Concealed Weapon Act (sec. 5, Stats. 1923, p. 696, as amended) as connected with the murder charge. He was also charged with the prior conviction on December

22, 1938, in New Mexico, of the violation of the National Motor Vehicle Theft Act, title 18, section 408, United States Criminal Code, a felony, and with having served a term therefor in a penal institution.

The defendant pleaded not guilty and not guilty by reason of insanity to the first charge. He entered a plea of guilty to the charge contained in count 2, and admitted the prior conviction. The trial on the plea of not guilty to the first count resulted in a verdict of guilty of murder in the first degree without recommendation. On a separate trial of the issue of sanity the defendant was found to have been sane at the time of the commission of the homicide. Sentence of death was imposed in accordance with law. The defendant appealed from the judgment of conviction.

Prior to the commencement of the trial proceedings, the defendant moved to quash the venire and entered a challenge to the jury panel on the ground that the board of supervisors of Placer County in selecting the jury list for the year 1938 had selected men only and had intentionally omitted all women. It was contended that the direction of section 204 of the Code of Civil Procedure requiring that the selection and listings of jurors should "be made of men and women suitable and competent to serve as jurors" was mandatory. The trial court denied the defendant's motion and the trial proceeded by selection of jurors from the venire composed exclusively of men.

The defendant now urges that the systematic exclusion of women from jury service in Placer County precluded him from having a trial by an impartial jury and was a denial of due process of law. Actual failure of impartiality in the jury selected is not argued. The defendant is content to rest upon the theory that absence of women from the jury lists, as matter of law, presumes some prejudice to his rights, because, forsooth, women may not be as likely to impose the death penalty.

The point has been decided adversely to the defendant's contentions. (*People* v. *Shannon*, 203 Cal. 139 [263 Pac. 522].) The cited case involved a conviction of murder in the first degree with the imposition of the death penalty. The trial had taken place in Amador County. The same conditions existed here as were stated in the opinion in that case, namely, that women were not included in the jury lists be-

cause of absence of accommodations which would serve the needs of a mixed jury in the event it became necessary in the trial of a criminal action to house the jury overnight. The same contention was made there as here. In disposing of the point the court stated: " . . . there is nothing in the state or federal constitutions, or in any statute, which guarantees one accused of a crime a trial by a jury composed of men and women, or of only men, or of only women, or of any definite proportion of either sex. His right is to a fair and impartial jury, and not to a jury composed of any particular individuals. (*People* v. *Durrant,* 116 Cal. 179, 199 [48 Pac. 75].) He cannot complain if he is tried by an impartial jury, and can demand nothing more. (*Brown* v. *New Jersey,* 175 U. S. 172, 175 [44 L. Ed. 119, 20 Sup. Ct. 77], see, also, Rose's U. S. Notes.)" Also to the same effect is the decision in *People* v. *Manuel,* 41 Cal. App. 153 [182 Pac. 306], where the defendant, a woman, was on trial and the jury panel consisted exclusively of women. The defendant relies especially on *People* v. *Hines,* 12 Cal. (2d) 535 [86 Pac. (2d) 92], wherein a negro was convicted by a jury from which members of his own race were arbitrarily excluded. On appeal the judgment was reversed. Such cases are not controlling. The defendant in the present case was not tried by a jury from which all members of his own race were arbitrarily excluded.

The provisions of the code sections relied upon are directory and not mandatory. (*People* v. *Durrant,* 116 Cal. 179, 194 [48 Pac. 75].) Failure of substantial compliance therewith has not been shown nor does any prejudice to the rights of the defendant appear.

On the evening of July 16, 1938, Margaret Brusso entered her home in Roseville, California, in a bruised and hysterical condition. Later and about 8 o'clock that same evening, her sister, Ruth McElroy, with the latter's husband, George McElroy, leaving Margaret at home, started out to find and identify a laundry truck driver who allegedly had attacked Margaret. They went to Zeller's confectionery in Roseville. They found no one there answering the description given by Margaret. Soon, however, the defendant entered and the McElroys asked him if he was "Gordon Tillot". He countered with, "Where is Margaret?" On further conversation he denied that he worked for the laundry, stated that he

was from Chicago, that he was hot, that he was tough, that George McElroy was a young man and if he wanted to stay young and valued his life they had better let him alone. The three walked to the front of Zeller's and along the street. Others stopped and listened to their conversation. At no time did the McElroys make any specific accusation. Ruth McElroy asked the defendant to roll up his sleeve so that she could observe any tattoo marks. The defendant evaded the request. They asked him if he was the chap who had brought Margaret down from Auburn earlier in the day, which he denied. He kept his right hand inside his jacket. He repeated his statement to George McElroy that if he valued his life he had better let him alone, that he was a pretty young man to die. Asked if he would walk to their home to see Margaret, he suggested that the McElroys go for her and bring her back. When they refused to leave him and after some further conversation and an attempt by George McElroy to borrow from a friend and bystander a car in which to go for Margaret, the defendant said, ''Well, come on.'' The three started walking down the street in the direction of Margaret's home. The defendant was walking inside next the buildings, George McElroy in the middle and his wife on his right. They proceeded quietly without conversation for a few paces when suddenly the defendant turned, faced George McElroy, whipped a gun from inside his jacket and fired one shot at him with fatal effect.

The defendant testified that McElroy took hold of his coat collar as though in a threatening manner, and that he intended to use his gun only to frighten him away; that he was unfamiliar with the mechanism of the gun and that it was discharged unintentionally. But there is credible testimony, which the jury obviously believed, that when the shot was fired the gun was held out at arm's length at a distance of about three and one-half feet from the victim who had his arms down at his side. From this evidence the jury was justified in concluding that the shot was intentional and in cold blood.

While Ruth McElroy went to her husband's assistance the defendant escaped into the darkness. That same night a Ford roadster was stolen in Rocklin, California. On August 1, 1938, it was recognized by highway patrol officers at Eureka, California, as it was being driven along the high-

way. The car was stopped. The defendant was in it and was ordered out for questioning. He attempted to escape. At a command to "Halt!" and a gun charge fired into the air by one of the officers, he aimed several shots at the officers from the same gun which killed George McElroy. The discharges missed their mark and he was captured and disarmed.

■ The defendant assigns prejudicial error in the admission over his objection of a record of conviction in 1930 of an escape from a federal reformatory in Ohio, a felony. This conviction was not included in the indictment. The alleged purpose of admitting it in evidence was to show motive; that is, that the defendant having been previously convicted of a felony was aware that his apprehension while carrying a loaded gun concealed upon his person would result in the conviction of a felony, and that he preferred to "shoot his way out". Another alleged purpose of the evidence was to prove that the carrying of a concealed loaded weapon amounted to a felony and that a homicide perpetrated while committing such felony amounted to possible second degree murder. (Sec. 189, Pen. Code.)

By the provisions of sections 1025 and 1093, subdivision (1), of the Penal Code the prior conviction charged in the indictment and admitted by the defendant could not be read to the jury nor alluded to on the trial. The prosecution contends, however, that the evidence of a prior conviction, whether of one charged and admitted or of one not charged, is admissible when such prior conviction is an essential element of the offense charged, or is pertinent to prove motive.

The case of *People* v. *Oppenheimer,* 156 Cal. 733 [106 Pac. 74], relied on by the prosecution, is not comparable on the facts. There the defendant was undergoing a life sentence in San Quentin when he committed an assault with a deadly weapon. Section 246 of the Penal Code prescribes the death penalty when such an assault is committed by a life convict. Pertinently the court observed that proof of the prior conviction could not be avoided when it was an essential element of the crime charged. In the present case the prior conviction did not have to be proved to establish any element or degree of the crime of murder. Section 189 of the Penal Code does not define *every homicide* other than first degree murder as murder of the second degree. In the present case the

question for the jury was whether the homicide was first degree murder, as defined in said section 189, or was accidental or in self-defense.

However, where the shooting was, as here, claimed to have been accidental, the court could properly determine that the prior conviction had some bearing upon a possible motive to shoot with deliberation, which the defendant might have entertained. (*People* v. *Pool,* 27 Cal. 572, 573; *People* v. *Brown,* 53 Cal. App. 664 [200 Pac. 727].) ■ Whether the evidence had sufficient weight to that end, or whether the introduction was sought merely to prove that the defendant was a man of vicious tendencies and therefore likely to have committed the homicide intentionally, were questions primarily for the trial court to determine. In any event, we observe no prejudice because of the introduction of such evidence. The defendant was condemned by the undisputed evidence of his own conduct at, immediately prior to, and following the shooting of George McElroy. It cannot be said that the same or another jury, without the evidence objected to, would have returned a different verdict.

■ The defendant also assigns as error the refusal of the trial court to permit him to cross-examine Ruth McElroy fully as to the purported events involving the assault upon Margaret Brusso. He contends that such cross-examination was offered, not as proof of the facts to be adduced, but as tending to prove that the decedent was the aggressor and that the shooting was in self-defense. It is obvious from the facts stated that the court permitted sufficient evidence of the purpose of the McElroys' visit to the confectionery store, and of their questioning the defendant, to accomplish the end desired by him. The trial court properly concluded that further cross-examination would serve no relevant purpose and might confuse the issues.

The defendant had a full and fair trial by an impartial jury, and nothing prejudicial to his rights is disclosed.

The judgment is affirmed.

Curtis, J., Edmonds, J., and Houser, J., concurred.